FILED
09/09/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 4, 2019 Session

**IN RE ESTATE OF JOHN E. MAYFIELD**

**Appeal from the Chancery Court for Cheatham County**
**No. P-2880      Suzanne Lockert-Mash, Judge**

_____

**No. M2018-01977-COA-R3-CV**

_____

D. MICHAEL SWINEY, C.J., dissenting.

I respectfully dissent from the majority's reversal of the Trial Court's order dismissing Mr. Saltsman's claim. I instead would affirm the dismissal because Mr. Mayfield informed Mr. Saltsman before Mr. Saltsman ever even saw it that the Commercial Purchase and Sale Agreement ("the Purported Instrument") was invalid and, as the majority states, "had to be rewritten . . .", and Mr. Saltsman acknowledged and agreed to that.

It is well-recognized that a lawyer is a client's agent. *World Relief Corp. of Nat'l Ass'n of Evangelicals v. Messay*, No. M2005-01533-COA-R3-CV, 2007 WL 2198199, at *5 (Tenn. Ct. App. July 26, 2007), *no appl. perm. appeal filed*. Someone in Mr. Mayfield's attorney's office where the document had been drafted alerted Ms. Clayton, who in turn informed Mr. Saltsman, that the Purported Instrument was invalid and would have to be rewritten. As to how those events unfolded, the Trial Court found Ms. Clayton's testimony more credible than Mr. Saltsman's as to her informing Mr. Saltsman of the document's invalidity and his response. The record is silent as to what the problem was with the Purported Instrument to render it invalid. That, however, does not matter. When Mr. Mayfield's attorney informed Mr. Saltsman through Ms. Clayton before Mr. Saltsman even saw it that the Purported Instrument was "the wrong contract" and would have to be rewritten, it was as though Mr. Mayfield himself had torn it up before Mr. Saltsman saw it. Mr. Saltsman then both acknowledged and agreed to the repudiation of the document, not of their agreement whatever it was, but only this document. Mr. Saltsman even proposed a new term—that his company rather than him personally be named as the buyer in the new document. Thus, Mr. Saltsman's own expectation and agreement was that a new document would be drafted and that the original document would not be used.

In the majority's view, Mr. Mayfield's signature on the Purported Instrument constituted an acceptance of Mr. Saltsman's offer, and sealed it once and forever leaving nothing more to consider regarding offer and acceptance. However, notwithstanding the language describing Mr. Saltsman as the buyer/offeror, the Purported Instrument was drafted by Mr. Mayfield's attorney's office. In fact, according to the majority's opinion, "Mr. Saltsman accepted what he believed was Mr. Mayfield's counter-offer." Mr. Mayfield could have inserted any term he wanted. If Mr. Mayfield had, for example, either intentionally or by error made the price $2,000,000 rather than $950,000, would Mr. Saltsman be stuck with paying that sum even though he never agreed to it just because Mr. Mayfield drafted and signed the Purported Instrument? Mr. Saltsman, quite understandably and correctly, would say no. Mr. Saltsman cannot be bound by terms he never agreed to just as he cannot bind Mr. Mayfield to the repudiated Purported Instrument.

The majority characterizes the Purported Instrument as a mere memorialization of the parties' oral contract. For a sale of land, the Statute of Frauds requires a writing signed by the party to be charged, in this case Mr. Mayfield. *See* Tenn. Code Ann. § 29-2-101(a)(4) (2012). Our Supreme Court has explained that while "[t]he Statute of Frauds does not require a written contract . . . the writing required by the Statute of Frauds must contain the essential terms of the contract . . . ." *Waddle v. Elrod*, 367 S.W.3d 217, 226 (Tenn. 2012). As to the policy rationale for the Statute of Frauds, our Supreme Court has stated that "[t]he primary purpose of the Statute of Frauds is to reduce the risk of fraud and perjury associated with oral testimony." *Id*. at 223.[1] Mr. Saltsman is not seeking specific performance of his and Mr. Mayfield's oral agreement but instead asked the Trial Court, and now this Court, to order specific performance of this particular repudiated document.

The majority simply discounts Ms. Clayton's testimony and describes it as "extraneous and irrelevant . . . ." I could not disagree more. As correctly stated by the majority, "Ms. Clayton facilitated the parties' agreement by communicating to each party on behalf of the other. Mr. Mayfield and Mr. Saltsman never met and never communicated directly with one another." The majority then continues by setting out clearly that Ms. Clayton negotiated the agreement between Mr. Mayfield and Mr. Saltsman.

---

[1] The Dead Man's Statute, Tenn. Code Ann. § 24-1-203, has a somewhat similar purpose, which is "'to prevent the surviving party from having the benefit of his own testimony, when, by the death of his adversary, his representative was deprived of his executor's version of the transaction or statement.'" *Holliman v. McGrew*, 343 S.W.3d 68, 73 (Tenn. Ct. App. 2009) (quoting *McDonald v. Allen*, 67 Tenn. 446, 448 (1874)).

The majority, without referring to the parol evidence rule by name, attempts to use that rule to say that Ms. Clayton's testimony on this issue of document repudiation never should have been considered. I disagree. First, there was no objection to this testimony at trial, and the testimony was admitted. It is not the role of this Court to raise objections to testimony that were not raised by a party at trial. We do not try the lawsuit for any party. Additionally, Ms. Clayton's testimony about telling Mr. Saltsman that the written document was invalid and would have to be rewritten does not in any way involve "interpreting the Agreement" as argued by the majority. It does fit perfectly with her being the sole source of any communications between Mr. Saltsman and Mr. Mayfield. This testimony of Ms. Clayton was not offered to show anything as to the oral agreement between Mr. Saltsman and Mr. Mayfield. It was offered only to show that Mr. Mayfield, through his attorney's office that drafted the document, notified Ms. Clayton who then notified Mr. Saltsman before he ever saw the document that it was invalid and would have to be rewritten. This was not a repudiation of the agreement between Mr. Saltsman and Mr. Mayfield, whatever that agreement was. It was, however, notice that the document, for whatever reason, would have to be rewritten. Mr. Saltsman agreed to the repudiation of that document, and we know that because Ms. Clayton testified that Mr. Saltsman said "okay" and asked for a change of the terms, who the buyer was, in the new written contract.

The parties tried to reach a deal but they ran out of time due to Mr. Mayfield's demise. The majority's statement that "Mr. Saltsman expressed . . . a willingness to sign the Agreement . . ." is correct only to the extent that he expressed this "willingness to sign the Agreement . . ." only weeks or perhaps even months after Mr. Mayfield's death with no new document signed by Mr. Mayfield being possible. I cannot agree with ordering specific performance of a writing (1) repudiated by a party before the other party to the transaction ever even saw it and (2) where that other party acknowledged and agreed to the repudiation and even proposed a change of terms to include in the new instrument he fully expected to be drafted. The end result here is that this Court effectively has ordered specific performance of a written document that the parties to that document agreed was repudiated and would not be the written contract as to their agreement. I respectfully dissent.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-3-